**Affirmed and Memorandum Opinion filed April 11, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00676-CR

---

**THERON OWENS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 178th District Court
Harris County, Texas
Trial Court Cause No. 1167769**

---

## M E M O R A N D U M   O P I N I O N

Appellant Theron Owens challenges his conviction for capital murder on the grounds that the trial court erred (1) in failing to suppress his written and oral statements allegedly taken in violation of his *Miranda*[1] rights and (2) denying his

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

motion for mistrial on the basis of the allegedly false testimony of one of the investigating officers.[2]  We affirm.

**BACKGROUND**[3]

Appellant was convicted of capital murder.  Prior to his trial, the trial court heard his motion to suppress several statements made to police.  These statements included two voluntary statements made on May 17, 2008, in which he denied his involvement in the offense, and a second voluntary statement made on May 20, 2008, in which he confessed to the murder of his mother, Joyce Owens, and grandmother, Alberta Walker.

Late in the evening on May 16, 2008, appellant "discovered" the bodies of his sixty-three-year old mother and eighty-four-year old grandmother in the home he shared with them in Harris County, Texas.  After Harris County Sheriff's Office ("HCSO") deputies arrived, he and another witness were placed in handcuffs in the back of separate HCSO patrol vehicles.  HCSO Sergeant Roger Wedgeworth was assigned to lead the investigation into the murders of appellant's mother and grandmother.  Wedgeworth arrived at the scene at about 1:30 a.m. on May 17.  At the scene, he spoke with members of the HCSO crime scene unit, who informed him that it appeared that the scene had been staged to look like a burglary.

---

[2] Because the trial court failed to file findings of fact and conclusions of law, this appeal was abated and remanded to the trial court for such determinations.  Our record has been supplemented with these findings and conclusions, and this appeal has been reinstated. Appellant's fourth issue concerning this failure by the trial court has been rendered moot by the filing of these findings and conclusions.

[3] Appellant has not challenged the sufficiency of the evidence.  Thus, we discuss the facts briefly here and as necessary throughout the opinion to address appellant's issues.

Wedgeworth asked HCSO deputies to retain appellant's clothing because appellant had been in contact with the decedents. When appellant removed his outer clothing, deputies discovered that he was wearing a pair of grey sweatpants and a white tank shirt underneath.

Because appellant was the last person to see the decedents alive and the first person to "discover" their bodies, Wedgeworth had a deputy transport appellant to the HCSO homicide division offices located in downtown Houston. Wedgeworth intended to take appellant's statement as a witness. Wedgeworth did not provide appellant with *Miranda* warnings because appellant was not in custody and was providing a witness statement. Wedgeworth interviewed appellant in an administrative office in the early hours of May 17, 2008; appellant signed a voluntary written statement, describing his version of the events of the day.

After taking appellant's written statement, Wedgeworth asked appellant to take a polygraph examination, and appellant consented. Appellant's polygraph examination indicated that he was being deceptive. He was escorted into an interview room for further questioning. Wedgeworth contacted HCSO Sergeant Craig Clopton to assist him in interviewing appellant.

Wedgeworth and Clopton began a videotaped witness interview of appellant at about 8:30 a.m. Both were wearing plainclothes, and their firearms were not visible. Appellant was not provided *Miranda* warnings prior to or during this interview. Appellant was not handcuffed. Throughout this interview, which lasted several hours, appellant made no admissions of guilt or any incriminating statements. He never asked for any food or drink or to leave. At the conclusion of the interview, Clopton and another deputy drove appellant home.

Appellant contacted Quanell X Farrakhan, a community activist and leader of the New Black Panthers and New Black Muslim movement. Initially, appellant

3

told Farrakhan that he was being harassed by police for a crime he had not committed. Farrakhan contacted Clopton, whom he knew from a prior investigation. Clopton informed Farrakhan that appellant was the HCSO's only suspect in connection with the deaths of appellant's mother and grandmother. Farrakhan met with appellant and offered to help him if he were being harassed by the police and was innocent of the crime. Farrakhan also told appellant that he could help him "in other ways" if appellant had anything else he wanted to say. Appellant told Farrakhan that the HCSO deputies had not abused him in any way when they interviewed him.

The next morning, appellant contacted Farrakhan and said that although he did not need Farrakhan's help "fighting" the police, he did want Farrakhan's help in another way. Appellant met with Farrakhan and confessed to murdering his mother and grandmother by stabbing them. Farrakhan told appellant not to give him any more details about the crime, but assured appellant that he would do what he could to ensure appellant's safety when appellant confessed to the police. Farrakhan contacted the HCSO to advise them that he was bringing appellant in to confess. He then escorted appellant to the HCSO homicide division.

Clopton and Wedgeworth met Farrakhan and appellant at the HCSO's homicide division offices. Investigators separated Farrakhan and appellant to take their statements. In a written statement, Farrakhan described the conversations he had with appellant. Clopton and Wedgeworth took appellant to an interview room to take a videotaped statement. Wedgeworth read appellant his *Miranda* warnings, and appellant indicated that he understood each warning. Wedgeworth then stated, "Now, at this point you have voluntarily [come] to our office and I am going to ask you, Do you waive the rights that I just read to you and agree to talk to us about what has taken place?" Appellant responded, "I would like to have an attorney

4

present while I talk to you, but I will be fully cooperative with you and tell you everything, tell you the truth." Wedgeworth responded, "Okay." Appellant almost simultaneously volunteered, "I committed the crime. I did commit the crime." Wedgeworth left the room, indicating he was going to inquire about a lawyer.

Clopton remained in the room with appellant. Appellant volunteered several statements to Clopton, including that Farrakhan was a "good man." Wedgeworth reentered the interview room, and the following colloquy took place:

> WEDGEWORTH: I just talked to Marlin Tatum [phonetic] and I can get you -- do you have an attorney?
>
> APPELLANT: No, sir.
>
> WEDGEWORTH: I can get you a phone book.
>
> APPELLANT: I need a court-appointed attorney. I can't afford an attorney, sir.
>
> WEDGEWORTH: Okay. Well, he is saying up until the time you are charged, we can't just go out on the street and get you an attorney --
>
> APPELLANT: Yes, sir.
>
> WEDGEWORTH: -- you know? So, you know, at this point, I don't know what to tell you. If you don't want to talk at this point, you know, without having a lawyer right here with you, you know, then --
>
> APPELLANT: Can I speak with Quanell?
>
> WEDGEWORTH: Okay.
>
> APPELLANT: Thank you. Yes, sir.

Shortly after this exchange, Wedgeworth left the room again. Appellant reengaged in conversation with Clopton, with no prompting or questioning from Clopton. Appellant began crying and was visibly upset. He stated,

> I know only God can charge me. You know, people tell me, Don't cry about this. You weren't crying when you were killing your parents. Think about how they cried, how they suffered. Why should you suffer now and you should suffer more than them, you know?

5

> In reality, I know I should have. I know I should have, because what I did was very wrong. It was wrong. . . .
>
> I would like an attorney present to push me, to tell, you know what I'm saying. I don't know all about that, man. And I know I'm faced with capital murder.

Clopton responded that, because appellant had asked to speak with an attorney, they had to "step back until that happens" unless they had appellant's approval to speak with him. Appellant made several other voluntary statements to Clopton acknowledging his responsibility for the death of his mother and grandmother. When appellant asked Clopton if he was doing the right thing by not talking to them without a lawyer, Clopton responded that he could not give him legal advice.

Wedgeworth reentered the interview room, again offering to get an attorney's number for appellant. Appellant responded that he could not afford an attorney, so it would do him no good to contact one. Appellant added,

> That's why I asked if I could speak with Quanell and he could advise me or either tell me what he think would be the best course of action, you know. *I am admitting I did what I did. I did this. I did it. And I do want to reveal it.* I want to talk to you about it. I don't want to hide. I don't want to lie. I don't want to play anymore.

(emphasis added). Wedgeworth told appellant that an attorney would probably tell him not to talk to them. Appellant responded that he appreciated Wedgeworth's statement, but said that he still wanted to speak to Farrakhan. Wedgeworth left the room after this exchange. He returned to advise appellant that Farrakhan was giving his own statement; he stated he would bring Farrakhan to the interview room when Farrakhan had completed his statement.

Farrakhan entered the room shortly thereafter. Clopton left the room and appellant and Farrakhan spoke privately. Farrakhan encouraged appellant to tell the truth. Farrakhan left the interview room after speaking briefly with appellant.

6

Clopton reentered and said that Farrakhan had told him that appellant wanted to speak with him. Appellant responded, "Yeah. I am ready to talk, without the attorney." Clopton read appellant his *Miranda* warnings again. Appellant acknowledged that he understood these rights, and he explicitly waived them. He then told Clopton, "I want to confess to the murder of my grandmother and my mother." He proceeded to provide details of the offense and explain the lies he had told in his previous statements.

During the pretrial hearing on appellant's motion to suppress, Wedgeworth and Clopton both testified that appellant was not in custody at the May 17 video-taped interview, that he was free to leave at any time, and that, although they began to suspect that he had murdered his mother and grandmother based on inconsistencies in his statements and evidence from the crime scene, they did not have enough evidence to bring charges against him either before or after the interview. Wedgeworth testified that after appellant completed his interviews on May 17, he and the rest of the investigative team reviewed and critiqued everything appellant had said in both his written and videotaped statement. Wedgeworth testified that sometime after the first interviews were completed on May 17 and before he and Clopton returned to appellant's home the next day, they determined that appellant was their suspect.

Later, during appellant's trial, Wedgeworth testified similarly. Wedgeworth referenced inconsistencies in appellant's May 17 statements that he and his team were "keying in on." Additionally, he stated that, when he and Clopton returned to appellant's home, he told appellant's relatives that appellant was their primary suspect. Wedgeworth also explained that, while at appellant's home speaking to appellant's relatives, he told appellant that he needed to "come clean."

7

After Wedgeworth testified, appellant moved for a mistrial, asserting that Wedgeworth had testified during the motion-to-suppress hearing that appellant was not a suspect on May 17, while his trial testimony reflected that appellant was a suspect on May 17. Appellant asserted that Wedgeworth's trial testimony differed materially from that his pretrial testimony. He asserted that the only remedy for such "false" testimony was a mistrial. The trial court denied appellant's motion for mistrial.

After the close of evidence and argument, a jury convicted appellant of capital murder. The trial court assessed punishment at confinement for life without the possibility of parole. Appellant timely filed this appeal.

## MOTION TO SUPPRESS

In his first issue, appellant asserts that the trial court erred in not suppressing his May 20, 2008 statement because his *Miranda* rights were violated. Appellant challenges the trial court's failure to suppress his May 17, 2008 statement, contending that he was in custody and his *Miranda* rights were not provided to him in issue two.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). Because the trial court observes the demeanor and appearance of witnesses, it is the sole trier of fact and judge of the credibility of witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000) (en banc). When reviewing a trial court's denial of a motion to suppress, we afford almost total deference to the court's express or implied determination of historical facts, while reviewing the court's application of the law

to the facts de novo. *Wiede*, 214 S.W.3d at 25. The prevailing party in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

## B.   Invocation of Right to Counsel – May 20, 2008 Statement

In *Edwards v. Arizona*, the Supreme Court of the United States held that once an accused has expressed his desire to deal with the police only through counsel, all custodial interrogation must end "unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484–85 (U.S. 1981). The Texas Court of Criminal Appeals has adopted a two-step process to determine whether the *Edwards* rule has been met: (1) proof that the suspect himself initiates further communication with authorities after invoking the right to counsel, and (2) proof that, after he re-initiates communication with authorities, he validly waives his right to counsel. *Cross v. State*, 144 S.W.3d 521, 527–30 (Tex. Crim. App. 2004) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1044–46 (1983) (plurality op.)).

> Because the *Edwards* rule was devised to prevent police from badgering a suspect into giving up his right to counsel, compliance with that rule, coupled with a suspect's re-initiation of communications about the investigation, plus a voluntary waiver of his previously invoked right to counsel, fully satisfies the rule. Its protections fall away.

*Id.* at 528. Thus, we must determine whether there is proof of this two-step process here.[4]

---

[4] This case differs from the usual application of *Cross* in that appellant voluntarily came into the HCSO homicide division to confess to the murders of his mother and grandmother.

9

As described above, on May 20, 2008, HCSO Sergeants Wedgeworth and Clopton escorted appellant into an interview room, and Wedgeworth read *Miranda* warnings to appellant. After appellant was advised of his rights, he asked for an attorney to be present while he talked to them, but stated, "I will be fully cooperative with you and tell you everything, tell you the truth." Without any further questioning from either Wedgeworth or Clopton, appellant volunteered that he had "committed the crime." Wedgeworth then left the room to inquire about an attorney for appellant. Neither Wedgeworth nor Clopton questioned appellant any further after appellant invoked his right to counsel.

After appellant had "invoked" his right to counsel, he volunteered several statements to Clopton, acknowledging his responsibility for the deaths of his mother and grandmother. Even though Wedgeworth provided incorrect information to appellant regarding when appellant was entitled to the appointment of counsel, appellant continued throughout the entire interview to speak to Clopton about the offense, both before and after Wedgeworth gave him this information. Indeed, he volunteered that he had committed the crime *before* Wedgeworth provided this incorrect information. Neither Wedgeworth nor Clopton questioned appellant about the offense after he invoked his right to counsel; instead, appellant continued to initiate conversation with Clopton and made other incriminating statements. In fact, Wedgeworth even told appellant that an attorney would probably advise him *not* to speak to them. The trial court found, and the record supports, that appellant re-initiated conversation with the authorities about the investigation. There is ample evidence of the first step of the above-described process. *See id.* at 528.

Further, before any further questioning of appellant regarding this offense occurred, Clopton re-advised him of his *Miranda* rights. Appellant clearly and

10

unequivocally waived these rights before Clopton questioned him about this offense. Thus, there is proof that, after appellant re-initiated communication with authorities, he validly waived his right to counsel. *Id.*

We conclude that appellant's recorded confession was not taken in violation of *Edwards*: appellant took "himself out from under the protection of the *Edwards* bubble." *Id.* Accordingly, the trial court did not abuse its discretion in denying his motion to suppress his May 20, 2008 statement. We thus overrule appellant's first issue.

## C.    "Custodial" Interrogation – May 17, 2089 Statements

In his second issue, appellant complains that the trial court abused its discretion in denying his motion to suppress his exculpatory written and oral statements taken on May 17, 2008. Specifically, he asserts that, because he was in custody at the time these statements were taken, the trial court erred in admitting these statements because his *Miranda* rights were violated. The State acknowledges that such error, if it occurred, is of a constitutional nature.

We must reverse a conviction involving constitutional error unless, reviewing the entire record, it is apparent beyond a reasonable doubt that the error did not contribute to the defendant's conviction or punishment. Tex. R. App. P. 44.2(a). In evaluating such error, we must "take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Snowden v. State*, 363 S.W.3d 815, 822 (Tex. Crim. App. 2011).

Here, regardless of any error in their admission, an issue we do not determine, we are convinced beyond a reasonable doubt that the admission of

11

appellant's May 17, 2008, exculpatory written and oral statements did not contribute to his conviction or punishment. First, as discussed above, appellant confessed to these offenses on May 20, 2008, and the trial court did not err in admitting his oral confession. Thus, the jury likely placed little weight on these exculpatory statements. *See id.* Additionally, the State did not emphasize appellant's exculpatory statements. *See id.* Moreover, there was overwhelming evidence of appellant's guilt in this case: (1) he confessed to killing his mother and grandmother; (2) a mixture of blood/DNA from both decedents and appellant's DNA was found on the clothes he was wearing *underneath* the clothes he had on when he "discovered" their bodies; (3) a mixture of appellant's DNA and the decedents' DNA was discovered in several of the bloodstains and on evidence discovered at the crime scene; (4) the scene appeared to have been staged to look like a burglary—there was no sign of forced entry or any items stolen; and (5) a blanket found in the back of the car appellant had been driving that night had the blood/DNA of his mother on it.

In sum, the State placed almost no emphasis on appellant's exculpatory statements. Further, there was overwhelming evidence of appellant's guilt in this case. Accordingly, even if the trial court erred in admitting appellant's exculpatory statements taken on May 17, 2008, we are convinced beyond a reasonable doubt that any error in admitting them did not contribute to his conviction or punishment.[5] We overrule appellant's second issue.

---

[5] Tex. R. App. P. 44.2(a). We note further that the State did not seek the death penalty in this capital-murder case, so appellant was automatically sentenced to life without the possibility of parole. *See* Tex. Penal Code § 12.31(a)(2). Because appellant's life sentence was automatic, these statements had no bearing on his punishment.

# MOTION FOR MISTRIAL

In his third issue, appellant asserts that the trial court erred in denying his motion for mistrial based on the allegedly false statements made at his trial by HCSO Sergeant Wedgeworth. A trial court may declare a mistrial in extreme circumstances when error is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Id.*

Here, appellant contends that Wedgeworth stated during the hearing on his motion to suppress that appellant was *not* a suspect on May 17, 2008, when appellant provided a written and oral statement to authorities. Appellant asserts that later, during trial, Wedgeworth testified that appellant *was* a suspect on May 17, 2008. Appellant's assertion is belied by the record, however.

Wedgeworth testified at trial, just as he had during the pretrial hearing on appellant's motion to suppress, that he believed appellant was being untruthful and began to suspect appellant when appellant's statements were inconsistent with evidence HCSO crime scene technicians were gathering from the scene. Wedgeworth testified at trial that, when he and Clopton went back to appellant's house to speak with appellant's relatives after they had interviewed appellant on May 17, they informed appellant's relatives that appellant was their "primary suspect." Wedgeworth similarly testified during the pretrial motion-to-suppress hearing that sometime *after* the first interviews were completed on May 17 and *before* he and Clopton returned to appellant's home, they determined that appellant was their primary suspect.

Here, Wedgeworth's trial testimony was consistent with his testimony during the pretrial hearing on appellant's motion to suppress. There is no support

13

for appellant's claim that Wedgeworth testified falsely. Accordingly, the trial court did not abuse its discretion in denying his motion for mistrial. We overrule appellant's third issue.

## CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.


/s/    Adele Hedges
        Chief Justice

Panel consists of Chief Justice Hedges and Justices Boyce and Donovan.

Do Not Publish — Tex. R. App. P. 47.2(b).